## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JOHN HERRMANN | § | |
| | § | |
| VS. | § | CIVIL ACTION NO: _5:20-cv-266_ |
| | § | |
| | § | |
| THE BOEING COMPANY | § | |

**PLAINTIFF JOHN HERRMANN'S ORIGINAL COMPLAINT AND JURY DEMAND**

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** John Herrmann, complaining of and about Defendant The Boeing Company ("Boeing"). John Herrmann alleges that he was discriminated against because of his disability and that he was retaliated against for bringing complains of race and sex discrimination, and for cause of action shows unto the Court the following:

### PARTIES AND SERVICE

1.      Plaintiff John Herrmann is a resident of New Braunfels, Texas within the Western District of Texas, San Antonio Division.

2.      Defendant The Boeing Company is an Illinois Corporation doing business within the Western District of Texas, San Antonio Division. It may be served with process by serving its registered agent for service of process, Corporation Service Company, 211 E. 7th Street, Suite 620 Austin, TX 78701.

### JURISDICTION AND VENUE

3.      This Court has jurisdiction to hear the merits of Plaintiff's claims as they are brought under Federal Law, specifically Title VII of the Civil Rights Act of 1964 and The Americans with Disabilities Act as Amended.

4.      This Court has supplemental jurisdiction over Plaintiff's claims arising under Texas statutory law under 28 U.S.C. § 1367.

5.      At the time of filing, damages are within the jurisdictional limits of this Court.

6.      All the acts alleged herein occurred within the jurisdiction of the Western District of Texas, San Antonio Division.

7.      Venue in this district and division is proper under 28 U.S.C. § 1391(b)(2).

## MISNOMER/MISIDENTIFICATION

8.      In the event that any parties are misnamed or are not included herein, it is Plaintiff's contention that such was a "misidentification," "misnomer," and/or that such parties are/were "alter egos" of parties named herein.  Alternatively, Plaintiff contends that such "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## CONDITIONS PRECEDENT

9.      Plaintiff asserts that all conditions precedent to the filing of this lawsuit have been met.

## FACTS

10.     Plaintiff John Herrmann is a 12 year employee of Defendant Boeing.

11.     He is employed as a Customer Training Specialist.

12.     Defendant classifies Customer Training Specialists on a level system from level 1 to level 5.  As an employee's level increases, so do their responsibilities and compensation.

13.     Mr. Herrmann worked for Defendant in Washington State prior to working for Defendant in the San Antonio/Universal City area in early 2018.  During his time in Washington State, Herrmann was a Level 4 for 8 years.

14.     Although Mr. Herrmann incurred $23,000.00 in out of pocket expenses and took a $45,000.00 a year pay cut as part of the move, he did so because he was told that he would be promoted from level 3 to level 4 within 6 months. However, when he arrived he never got the promotion.

15.     When Mr. Herrmann arrived at the Universal City location Thomas Gurno was his team lead.  Additionally, Curtis Frost became Mr. Herrmann's manager.

16.     After Mr. Herrmann started working under Gurno and Frost he learned that Gurno and Frost would regularly ask employees monitor their co-workers and create documentation to help them construct a basis for terminating other workers.

17.     For example, Curtis Frost asked Herrmann to note when certain co-workers were late and to note their job performance, even though these were not part of Herrmann's job duties.

18.     Mr. Herrmann had witnessed Gurno using profane and vulgar language towards two women co-workers Alexandra Hunter and Melisa Dickens. Gurno told them "I'm tired of getting these all fucked up.  I don't want to see another one of these until you un-fuck them.  This is fucking shit, and you are constantly fucking them up."

19.     Following the incident Ms. Hunter was in tears and even told Frost that she was quitting her job.

20.     Following the incident, Frost spoke with Gurno.  After they were done speaking Gurno called all the male employees to a private office area.  He told them "We have met the enemy, and they are the women.  The women are upon us.  This used to be a good place to work. If you think the women are your friends, they are not.  Be careful what you say to them or you are fucked.  I took one for the team, don't be like me."

21.     Herrmann reported this statement to Curtis Frost.  Frost then had the male employees come to his office and told them that "Tom's heart was in the right place."

22.     After this meeting Herrmann wrote emails to Frost telling him that Frost's characterization of Tom was not correct and that he was tired of Tom's inappropriate behavior.

23.     Gurno and Frost met on March 25th related to another incident, wherein Gurno referred to an assignment Herrmann was working on.  Gurno called Anthony Abbott Mark Sardelich and Herrmann to his office.  Christopher Vaughn and Trey Brock were also present.  He stated the work being performed by Abbott and Sardelich was critical to be accomplished by a specific date or Boeing would lose millions.  He then stated to Herrmann, pointing his finger, "And you, I don't know what you are still doing fucking around with the triple 7 modules, but I told you to fucking suspend them, and prioritize the fucking 737.  Read the fucking email."  Herrmann replied, "I read the email, and I know what you told me do. I will have the 37 modules done by the delivery date."  He then said, "Okay, well I am going to take you to Curtis about this."  During the March 25th meeting, Frost and Gurno discussed Herrmann's project.

24.     Frost spoke to Herrmann about the incident the next day March 26, 2019, and told Herrmann that he needed to have a one-on-one meeting with Gurno.

25.     However, at the beginning of the one-on-one meeting instead of discussing the work incident, Gurno began the meeting by telling Herrmann that he had read the emails Herrmann had sent to Frost and that he "Now knew things."

26.     Herrmann understood this to mean that Gurno had read the emails that Herrmann had sent Frost in confidence regarding Gurno's behavior regarding the statements Gurno had made to the women employees and the statements about women being the "enemies" of men.

27.     On March 29th, Herrmann and Frost had a quarterly performance assessment meeting.  Frost told Herrmann that he had concerns about Herrmann's job performance and that his performance had been poor.

28.     When Herrmann asked Frost to give him some examples of what performance was poor, Frost was unable to give any specifics and simply told Herrmann that Gurno had told him that Herrmann's performance was poor and that he had a "bad attitude."

29.     Herrmann knew he was being retaliated against for the complaints that he made and filed an ethics complaint.

30.     On or about March 30, 2019 Herrmann filed a complaint with Ellen Martin, the VP of Ethics & Business Conduct regarding the incident, his complaints to Frost, and Gurno's retaliation.

31.     Additionally Mr. Herrmann complained about other actions by his supervisors including Gurno's use of racist language including making statements about the "dark side of town," stating that things were "nigger-rigged" and using the slur "Spics" to describe Hispanics.

32.     Gurno also made sexual comments such as Chris would punch a hole in a petite woman during intercourse, and that John tried to punch holes in his wife every night.  On numerous occasions, when Herrmann would attempt to discuss task related issues with Gurno, Gurno would say to Herrmann and telling Herrmann "Let me guess, Trey (another male employee) is pregnant and you are the father."  Gurno also make statements to Herrmann that he was using "anal lube."

33.     Herrmann further complained that employees who made complaints about Gurno and Frost were retaliated against.  Herrmann also reported charging violations related to charging time against programs he wasn't working.  This was reported because Gurno had demanded

Herrmann record his time that way. When Frost discovered the violation, Gurno told Frost that Herrmann had been doing such, and became upset with Herrmann.

34.     Following the investigation into the complaint, Mr. Herrmann was informed by his employer that his statements were substantiated.  Herrmann was informed that as a result Gurno was given some time off without pay, Brian Keck received a warning and that Frost received some undisclosed form of corrective action.

35.     However, this only made things worse for Herrmann.  Frost told the entire staff that he had been through an ethics investigation and that his boss supported his use of coworkers to spy on one another.

36.     Mr. Herrmann has the disability of high blood pressure.  This condition can limit the major life activity of circulatory function during periods of high stress.  As a result of the stress he experienced at work, Mr. Herrmann began to take additional medication.

37.     Mr. Herrmann informed his supervisors that as a result of the medication he would sometimes experience drowsiness as a side effect.

38.     Mr. Herrmann also required surgery due to a longstanding rectal fistula condition. However, even after the surgery he had an open wound that would require regular cleaning.

39.     Mr. Herrmann noticed that either Chris Vaughn or Thomas Gurno would regularly follow him to the rest room when he went to clean his wound that remained from the surgery.  Mr. Herrmann was subject to increased scrutiny whenever he would get up from his desk.

40.     Other non-disabled employees were not treated similarly.

41.     Following the completion of the first investigation, and Gurno being restored to work, Frost called Gurno, Vaughn, Brock and Herrmann to his office, and he stated that everything was returning to normal, and Gurno was going to resume his leadership over Herrmann.  A few

weeks later, Gurno asked Herrmann to meet with him, Chris Vaughn and Frost in Frost's office. Gurno told Frost that he had a case against Herrmann for "massive quality control issues." When Herrmann tried to refute what Gurno was saying, Frost refused to listen and told Herrmann he had two weeks to improve or Frost would get involved, indicating to Herrmann that he was being set up to be terminated. Herrmann understood this to be retaliation for the complaints he made about Gurno's comments about the women and minority employees as well as the comments to himself, and Frost's lack of response to them.

42.    Frost and Gurno have continued to take retaliatory acts against Herrmann.

43.    Frost has said that people are "scared" of Herrmann, which Herrmann understood was related to the ethics complaint he brought against Gurno.

44.    Boeing issued a statement to Herrmann and his co-workers that they could be terminated if they discussed the issues raised by Herrmann. This intimidated and humiliated Herrmann and as a result many other employees do not engage with Herrmann and he is isolated.

45.    When Frost emails Herrmann he also carbon copies the department that was involved in the ethics investigation. He had not done this prior to Herrmann's complaints.

46.    Frost has privately and publicly derided Herrmann's work.

47.    Following the ethics investigation Frost asked Herrmann what his "next move" is. Herrmann understood this to be a reference to the complaints he made about Gurno and Frost regarding racial language, sexual language towards himself, and the incident with the women employees.

48.    Frost also told Herrmann that he "got you" coming to work late and leaving early.

49.    For the prior 10 years that Herrmann worked at Boeing, he was allowed to work through his lunch period, put in his 8 hour day and go home.  Herrmann does this because of his wife's work schedule.

50.    Frost was aware of this and initially approved the request.

51.    However, following the ethics complaint, Frost implemented a policy requiring Herrmann to take a lunch within the first 5 hours that he was on the job and to inform Frost of any changes.

52.    Herrmann has attempted to apply for other positions within Defendant that he is qualified for in an effort to move to a different location under different management.  However, Herrmann was rejected from selection for those positions, and has not received any justification as to why he was rejected.

53.    Herrmann is also aware that Gurno and Frost have asked other employees to report on errors by him, similarly to how they have tried to build cases to have others terminated.

54.    Defendant has taken steps that have fundamentally altered Mr. Herrmann's job and work environment in retaliation for his complaints about gender discrimination and support of women employees and his complaints about management's response to those incidents.

55.    The terms and conditions of Herrmann's employment have been fundamentally altered to the point that they are an adverse employment action.  Defendant's acts are geared towards making conditions so intolerable that Mr. Herrmann will quit or until a pretext reason for his termination can be created.

56.    There have been two separate and distinct retaliation campaigns involving Vaughn, Gurno, Sardelich, and Stohlman.  Herrmann's work has been falsely characterized, projects have been manipulated, and inaccurately reported.  Work instructions have been withheld, modified

after the fact, and expanded to include tasks not normally performed.  Project content has been concealed.  Communication between Herrmann and his leads and manager have been suspended when Herrmann required clarification on task instructions.  Herrmann's performance has been falsely reported to HR, and Herrmann's co-workers have been told Herrmann is a non-team player, a poor performer, and he has been characterized as the source of tension at the site.  Herrmann is the cause of tension in the site, that Herrmann is inappropriately characterized as a poor performer and non-team player.  Boeing has failed to address that Herrmann took a stand against sexism and racism.  Herrmann believes the retaliation has been related to his ethics complaint of sexism, racism and fraudulent charging, and was designed to force Herrmann out of the company, with an end goal of accommodating Gurno being promoted to site manager.

57.    The stress associated with Herrmann's work environment and has resulted in Herrmann requiring professional counseling and a regimen of anti-anxiety medication.  The stress has negatively affected his emotional, physical and relational health.  On one particular occasion Herrmann woke in the middle of the night with an anxiety attack to the extent that he vomited with such force that he dislocated a rib, requiring him to go to an emergency clinic and receive morphine for pain and medication to lower his stress.  Herrmann has been required to take a regimen of blood pressure lowering medications and sleep medications, in an attempt to offset the negative effects of the stress and anxiety related to his work.

58.    On December 20, 2019 Herrmann received his end of the year performance review. His manager uncharacteristically required HR be present for the review.  During the review his manager stated, "You should have seen the rating I originally had."  This was a comment related to a particular portion of the review, and Herrmann took the statement to mean that Frost had a much lower rating, but was required by HR to increase the value.  In the review Frost indicated

Herrmann was unwilling to receive feedback, unwilling to collaborate in project accomplishment, continually pushback on project completion and poorly performed throughout the year. However, during the first three months of 2019, prior to Herrmann filing his first ethics complaint related to sexism, racism, Herrmann's accomplishments earned props from Frost, to Frost's leadership.

59.     Further, throughout 2019, Herrmann was assigned, developed and completed 13 courseware modules, representing months of work, and requiring he collaborate with Trey Brock, Pete Robles, Steve Posey, Chris Vaughn, Bryan Atkinson, Brian Keck, and four subject matter experts in Seattle. Herrmann received high praise from Brock, Posey, Robles, and the subject matter experts in Seattle, in total contrast to Frost's characterization of Herrmann's 2019 performance.

60.     This has continued as Herrmann has been given the lowest performance ratings of any of the staff at his worksite. He was given poor ratings based on subjective criteria including the "first pass quality" of his work and claims that he is not inclusive.

61.     Herrmann believes Frost's characterization of his 2019 performance is in keeping with a narrative that Frost has tried to show Herrmann as a poor performer and non-team player, in retaliation for his ethics complaints related to sexism and racism rather than any actual performance deficiencies.

62.     As a result of these poor evaluations, Herrmann's bonuses and raises are lower than they would otherwise be, therefore affecting his income.

**RETALIATION FOR OPPOSING SEX DISCRIMIANTION IN VIOLATION OF CHAPTER 21 OF THE TEXAS LABOR CODE AND TITILE VII OF THE CIVIL RIGHTS ACT OF 1964**

63.     The evidence will show that:

(1) Plaintiff engaged in protected conduct when he opposed and brought complaints about sexually discriminatory behavior.

(2) Plaintiff is qualified for his position;

(3) Plaintiff suffered an adverse employment action in that he has suffered changes to the terms and conditions of his employment designed to make his employment intolerable.

(4) The circumstances raise an inference of retaliation for his protected conduct.

64.     The evidence will also show that Defendant's reasons for taking adverse employment actions against Plaintiff are pretextural.

## RETALIATION FOR OPPOSING RACE DISCRIMIANTION IN VIOLATION OF CHAPTER 21 OF THE TEXAS LABOR CODE AND TITILE VII OF THE CIVIL RIGHTS ACT OF 1964

65.     The evidence will show that:

(1) Plaintiff engaged in protected conduct when he opposed and brought complaints about racially discriminatory behavior.

(2) Plaintiff is qualified for his position;

(3) Plaintiff suffered an adverse employment action in that he has suffered changes to the terms and conditions of his employment designed to make his employment intolerable.

(4) The circumstances raise an inference of retaliation for his protected conduct.

66.     The evidence will also show that Defendant's reasons for taking adverse employment actions against Plaintiff are pretextural.

## DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AND THE TEXAS LABOR CODE

67.     The evidence will show that:

(1)  Plaintiff had a disability and/or was perceived as disabled due to his high blood pressure and bowel conditions.

(2)  Plaintiff is qualified for his position;

(3)  Plaintiff suffered an adverse employment action in that he has suffered changes to the terms and conditions of his employment designed to make his employment intolerable.

(4)  The circumstances raise an inference of retaliation for his protected conduct.

68.     The evidence will also show that Defendant's reasons for taking adverse employment actions against Plaintiff are pretextural.

## **PROMISSORY ESTOPPEL/DETRIMENTAL RELIANCE**

69.     The evidence will show that:

(1)  Defendant made a promise to Plaintiff that he would receive a promotion to the Level 4 position when he moved to Texas.

(2)  It was foreseeable to Defendant that Plaintiff would rely on that promise.

(3)  Plaintiff did in fact rely on that promise and sustained damages as a result.

## **RESPONDEAT SUPERIOR**

70.     Employees involved in the discrimination described herein were at all times employees, agents, or representatives of the Defendant and were at all times acting in the course and scope of that employment.   Accordingly, Defendant is liable for such conduct under the doctrine of Respondeat Superior.

## **DAMAGES**

71.     Plaintiff alleges that as a direct and proximate result of the conduct and/or omissions on the part of the Defendant, he is entitled to recover at least the following legal damages:

a.   Lost wages, past and future;

b.   Compensatory Damages, including Mental Anguish, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life suffered in the past, and which, in all reasonable probability, which will be suffered in the future;

c.   Pecuniary losses; and punitive damages

d.   Reasonable attorney fees, expert fees and costs.

e.   Based upon the above enumerated damages, the Plaintiff pleads for actual damages for the above damage elements in an amount the jury deems reasonable.

## ADMINISTRATIVE FILINGS

72.    Plaintiff filed his Charge of Discrimination with the Equal Employment Opportunity Commission and the Texas Workforce Commission Civil Rights Division dually alleging that the Defendant had committed and unlawful employment action against Plaintiff.

73.    Thereafter, Plaintiff received a "Notice of Suit" from the EEOC on both charges, giving Plaintiff notice of his right to sue Defendant within 90 days of its receipt, attached hereto as **Exhibit "A".**  Plaintiff has timely filed this Plaintiff's Original Complaint.

## ATTORNEY FEES

74.    Defendant's conduct as described in this petition and the resulting damage and loss to Plaintiff has necessitated Plaintiff's retaining counsel.  Therefore, Plaintiff seeks all reasonable and necessary attorney fees in this case which would include at least the following:

a.   Preparation and trial of the claim, in an amount the jury deems reasonable;

b.   Post-trial, pre-appeal legal services, in an amount the jury deems reasonable;

c.   An appeal to the Court of Appeals, in an amount the jury deems reasonable;

d.   Making or responding to an Application for Writ of Error to the Supreme Court, and attorneys' fees in the event that application for Writ of Error is granted, in an amount the jury deems reasonable; and

e.   Post-judgment discovery and collection in the event execution on the judgment is necessary, in an amount the jury deems reasonable.

## JURY DEMAND

75.   Plaintiff further demands a trial by jury.  A jury fee has been tendered.

## PRAYER FOR RELIEF

Wherefore, John Herrmann requests Defendant The Boeing Company, be cited to appear and answer, and that on final trial, Herrmann have judgment against Boeing as follows:

Judgment against Boeing for Herrmann's actual damages, including lost wages and benefits (both front and back pay) due to a failure to promote;

Judgment against Boeing for compensatory damages in the maximum amount allowed by law and for punitive damages;

An order that Boeing take such other and further actions as may be necessary to redress Boeing's violation of the Civil Rights Act, and the TCHRA;

Pre-judgment and post-judgment interest at the maximum allowed by law;

Costs of suit, including attorneys' fees; and

A trial by jury and such other and further relief, both at law and in equity, to which Herrmann may be justly entitled.

**Respectfully Submitted**


 _/s/    Alan Braun_____
**ADAM PONCIO**
**State Bar No. 16109800**

**salaw@msn.com**
**ALAN BRAUN**
**State Bar No. 24054488**
**abraun@ponciolaw.com**
**LORNA GRIFFIN**
**State Bar No. 24109947**
**lgriffin@ponciolaw.com**
**PONCIO LAW OFFICES**
**5410 Fredericksburg Road, Suite 109**
**San Antonio, Texas 78229-3550**
**(210) 212-7979 Telephone**
**(210) 212-5880 Facsimile**

**ATTORNEYS FOR PLAINTIFF**